## Reynolds, et al. v. Bracken County, et al.

(Decided June 24, 1921.)

### Appeal from Bracken Circuit Court.

1. Counties—Election to Provide for Sale of Bonds for Road Purposes—Fiscal Courts.—Where, prior to an election to determine

whether the voters of a county will authorize the issual and sale of bonds for turnpike and bridge purposes, the fiscal court of the county, upon recommendation of a committee appointed by its citizens at a mass meeting, enters an order classifying the various turnpikes of the county, and giving the mileage of each, and setting aside to each class a certain proportion of the fund to be realized from the bond sale, and providing that "each and every mile" of two classes of turnpikes named are to be improved with the proceeds, and fixing definitely the average cost per mile of such expenditure on the several classes of turnpikes, it was beyond the authority of the fiscal court to enter into any contract to pay out of the proceeds of the bond issue on any one pike an amount in excess of that fixed in the pre-election order.

2.  Counties—Election to Provide for Sale of Bonds for Road Purposes.—Even though the pre-election order was entered and the bond issue authorized by the voters with the purpose in view of getting the benefit of state aid in the reconstruction of the turnpikes, the fiscal court had no authority in contemplation of such state aid, to enter into a contract which would involve the payment out of the proceeds of the bond issue of a larger amount than that fixed in the order.

3.  Counties—Bonds for Road Purposes—Pleading.—The pleadings being uncertain and indefinite as to whether any work was done under the contract in issue before the filing of the suit, and no issue being made as to the propriety or legality of such payments, if any, all questions as to the legality of same are reserved.

M. J. HENNESSEY for appellants.

M. HARGETT, J. P. McCARTNEY, R. G. WILLIAMS and W. B. HARRISON for appellees.

OPINION OF THE COURT BY TURNER, COMMISSIONER—Reversing.

Appellants, citizens and taxpayers of Bracken county, brought this action seeking to enjoin that county, and its fiscal court, and the individual members thereof, from executing or carrying out a certain contract made by the fiscal court with the defendant Godfrey Miller for the reconstruction under the contract of certain turnpike work in that county, and seeking to enjoin them from appropriating any money or funds obtained from the sale of certain bonds authorized by an election held in that county in June, 1916, or applying any of the proceeds of the bonds to the repair or reconstruction of the turnpike in question, and to have declared void all warrants theretofore issued by the fiscal court in payment of any work done on the said turnpike under the contract.

Before answer an amended petition was filed, and the defendants demurred to the petition as amended, but, before action on the demurrer, filed their answer in two paragraphs and the plaintiffs thereupon demurred generally to the answer; and the court having overruled their demurrer to the answer, they declined to plead further, and their petition was dismissed, and they have appealed to this court.

In the petition as amended it is alleged, in substance, that in June, 1915, an election was held in that county upon the proposition whether the county should issue bonds for road and bridge purposes, and that the proposed bond issue was defeated at that time because the voters of the county did not know and were not made aware, prior to the election, what turnpikes in the county would be reconstructed or improved by the proceeds of the bond issue, or what amounts would be expended on each turnpike in the county, and that therefore after the calling of the second election for June, 1916, but some time before that election was held, and in order that the voters might vote intelligently on the said proposition, a mass meeting of the voters of the county was held, and at such meeting a committee designated as the good roads committee was appointed, consisting of a substantial citizen from each precinct in the county, and that this good roads committee, representing the voters of the county, formulated a plan classifying the various turnpikes, in the county, and distributing the proceeds of the proposed bond issue among them, and submitted their plan to the fiscal court of the county; and the fiscal court on the 26th of April, 1916, at a regular meeting, adopted the plan so formulated and submitted by the committee of citizens, and on that day, in compliance with the recommendation, entered the following order, to-wit:

"Whereas, there has been an election called in Bracken county, on the 17th day of June, 1916, for the purpose of taking the sense of the voters of said county on the question:

"'Are you in favor of issuing $200,000.00 in bonds for the purpose of building roads and bridges in said county,' and,

"Whereas, the voters and taxpayers of Bracken county have selected a committee, known as the 'Good Roads Committee' consisting of a substantial citizen

from each precinct to supervise and apportion fairly the road fund to be voted; and,

"Whereas, said committee has made an equitable and fair distribution of said road fund among the various precincts and on the various turnpikes of said county; now be it by the court:

"Resolved and ordered, that in accordance with the recommendation of said committee it is ordered and directed that the proceeds of the sale of all bonds to be voted at said election, June 17th, 1916, should result of said election favor the issuance of same, be and the same are hereby apportioned and allotted and to be used as and for the following purposes, to-wit:

"The following named turnpikes are classed as first class turnpikes and are to be and are hereby ordered to be reconstructed, each and every mile of same, according to state specifications, at a cost not to exceed an average cost of $1,600.00 per mile and the sum of $69,-600.00 is hereby ordered to be set aside out of said fund for the sole and only purpose of reconstructing said turnpike, and should there be any balance remaining after the proper construction of same, then said balance is to be used in the reconstruction of the second class turnpikes and become part of the _____ class turnpike fund.

"The first class turnpikes are as follows, to-wit:

"The Augusta, Brooksville, Milford and Claysville turnpike, from Augusta to Harrison county line 21½ miles; turnpike, Chatham to Germantown 5 miles; turnpike Germantown to Brooksville 5 miles; the Washington Trace turnpike from Powersville via Willow & Berlin to Lenoxburg 11 miles; Augusta to Dutch Ridge turnpike ½ mile. (Total 43½ miles.)

"The following named turnpikes are classed as second class turnpikes and are to be and are ordered hereby to be reconstructed, each and every mile of same, according to state specifications, at a cost not to exceed an average cost of $1,185.00 per mile and the sum of $130,-400.00 is hereby ordered to be set aside out of the fund for the sole and only purpose of reconstructing said turnpikes, and should there be any balance remaining after the proper reconstruction of same, then said balance is to be used as a fund for the repair of the third class turnpikes, same being all other turnpikes and dirt

roads other than the 1st and 2nd class roads in said county.

"Said second class turnpikes are as follows, to-wit:

"Parina and Mt. Olivet road, 7 miles; Augusta & Minerva road, 7½ miles; Dover & Augusta road, 6 miles; Dutch Ridge turnpike, 6½ miles; Augusta & Berlin turnpike, Augusta to Berlin, 11½ miles; Brooksville to Wellsburg road, 7 miles; Wellsburg and Gertrude road from Grainges to Hilton's, 3 miles; turnpike running from Foster & Lenoxburg turnpike to Locust creek bridge, 7 miles; Perkins Ridge road from Cumminsville to Bradford and Washington Trace road, 4½ miles; Belmont turnpike, Petra to Fanta Fe, 5 miles; Hillsdale turnpike, 2½ miles; Gertrude to Augusta and Brooksville turnpike, 3 miles; Germantown to Bradgeville, 6 miles; Two Lick turnpike, 1 mile; Bradford & Johnsonville turnpike to Washington Trace road at Morris, 6 miles; turnpike running from Lenoxburg to Bradford, 6½ miles; Lenoxburg and Foster turnpike, 5 miles; Mt. Olivet and Falmouth turnpike from Santa Fe via Milford to Holton's store, 9½ miles; turnpike from Willow via Holton's store to Pendleton county line, 5 miles.

"It is further ordered that all other roads in said county be and they are hereby classed as third class roads and it is ordered that only such repairs as are absolutely necessary be made on the first and second class turnpikes, to be reconstructed during the next two years, during which time they will be rebuilt; and that the balance remaining of the repair funds each year during the next two years and also the balance remaining of the road bond fund after the reconstruction of the first and second class roads, be used in repairing the third class roads.

"It is further ordered that any premium received for the said bonds, same should be about $6,000.00 or more, be used in purchasing crushers and road machinery."

It is further alleged that the order was properly passed and enacted by the fiscal court and entered on its records on that date and that before the holding of the election copies of the order were printed and published in the two newspapers of general circulation in the county, and on cards posted in every precinct thereof, and at every polling place therein.

It is further alleged that, by reason of the plan so formulated by the good roads committee in accordance

with their mandate from the mass meeting of citizens, and the subsequent adoption of that plan by the fiscal court, and the general advertising of the fact throughout the county that the court had adopted this plan, and because of the belief of the voters generally that this plan would be carried out, and all of the turnpikes of the county reconstructed or improved with the proceeds to be derived from the bond issue as set out in the order, the said bond issue was authorized and approved by the voters of the county at the said election.

It is further alleged that by reason of abnormal business conditions and the exorbitant cost of labor and materials, no action was taken by the fiscal court looking to the reconstruction of the turnpikes until 1919, at which time the turnpike leading from Augusta via Brooksville and Milford to the Harrison county line was contracted for.

It is further alleged that the fiscal court on the 19th day of June, 1920, at an adjourned meeting entered into a contract with the defendant Godfrey Miller for the reconstruction in that county of a turnpike of the first class known as the Washington Trace turnpike, running from Powersville to Lenoxburg, a distance of 10.57 miles, and that the fiscal court at that meeting accepted the bid of Miller for the reconstruction of the same, subject to the sale of the turnpike improvement bonds, and that the fiscal court thereafter, on the 30th day of June, 1920, by an order duly entered, made an agreement with Miller and others whereby they were to bid par for $50,000.00 of the bonds, to be dated August 21, 1920, and thereafter in August, 1920, made a sale of said bonds.

They further state that under the contract between the fiscal court and the defendant Miller for the reconstruction of Washington Trace turnpike for a distance of 10.57 miles, an expenditure of $7,100.00 per mile for the reconstruction is called for, and that the amount apportioned or appropriated for such reconstruction under the order of April 26, 1916, is only $1,600 per mile, and that the contract is therefore in violation of the order.

They further allege that on the same date the contract was entered into by the fiscal court with the defendant Miller, it also entered into a contract with others for the reconstruction of the turnpike from Brooksville to Germantown, and that the amounts called for in that contract for such reconstruction, and in the contract

with Miller for the reconstruction of the Washington Trace turnpike provided for the expenditure of $118,-966.00, which sum, together with the sum already expended on the pike to the Harrison county line, would exceed the whole of the proceeds of the bond issue authorized at the election, and that all of the other turnpikes and roads of the county of all classes, being 128 miles of turnpike, will remain unimproved and neglected, and that not one dollar of the proceeds of the bond issue has been expended on any of this 128 miles of turnpike.

And it is alleged that the fiscal court has thereby unlawfully and wrongfully diverted the proceeds of the bond issue so apportioned under the order to the other turnpikes of the county, and has violated and disregarded the pre-election order, and that the contract with Miller is illegal and void. And it is alleged that in the reconstruction provided for in the Miller contract it is contemplated and intended by the fiscal court that payment for same shall be made out of the proceeds of the sale of the bonds authorized at the election.

It is further alleged that the contract with Miller, including the existing indebtedness of the county, exclusive of the indebtedness authorized at the bond election, exceeded the income and revenue of the county for the year 1920 and that therefore the county had no power or authority to carry out or execute the contract without using the proceeds of the bond issue. They allege that the pre-election order of April 26, 1916, has never been repealed, altered or modified and was in full force at the time of the making of the contract with Miller and is still in force, and that it is the purpose of the fiscal court to use the proceeds of the sale of the bonds for the work to be performed on the Washington Trace turnpike under the contract with Miller.

In the first paragraph of the answer it is admitted that the two contracts for the construction of the Washington Trace road and the other contract made on the same day for the construction of the road from Brooksville to Germantown, will cost in the aggregate $118,-966.00, but it is denied that the entire proceeds of the $200,000.00 bond issue will be thereby exhausted; it is denied that all, or any, of the other turnpikes of the county named in the pre-election order have been or will be neglected, but it is averred that they will be hereafter improved.

It is alleged that they are faithfully carrying out the provisions of the pre-election order, and it is denied that the funds apportioned to the other turnpikes are being diverted to the turnpike named in the Godfrey Miller contract, or that the terms of the pre-election order, or any part thereof, have been disregarded or violated, or that the Miller contract is illegal or void.

In the second paragraph it is alleged that the Washington Trace turnpike is a part of project No. 57 provided for in chapter 17, Acts 1920 of the General Assembly of Kentucky.

It is alleged that on the 12th day of May, 1919, by order entered on the records of the fiscal court a contract was awarded to Miller & Miller for the reconstruction of the Brooksville and Augusta turnpike road, and that on the 9th of June, 1919, the fiscal court, by written order, awarded the contract for the reconstruction of the road from Brooksville to the Harrison county line, and that the part of the road from Augusta to Brooksville is a part of project No. 48, and the part thereof from Brooksville to the Harrison county line is a part of project No. 58½, as provided for in chapter 17, Acts of 1920 of the General Assembly of Kentucky; and that all the contracts for reconstruction of roads mentioned herein were made subsequent to the enactment of the road law of 1918 and governed by that law.

It is alleged that the turnpike road leading from Augusta to the Harrison county line via Brooksville, was a part of project No. 48 and project No. 58½, and consisted of 20.23 miles of turnpike and was constructed at a cost of $77,390.48; that the cost of the turnpike from Brooksville to Germantown, a distance of 5.95 miles, which is a part of project No. 57, under the contract is $43,924.76; and that the cost of the construction of the Washington Trace turnpike leading from Brooksville to the Pendleton county line, a distance of 10.57 miles, which is a part of project No. 57, under the contract will be $75,043.05; and that the aggregate cost or contract price for the construction and proposed construction of all three of the roads is $196,358.29.

The defendants aver that in the award of all of the contracts it was the purpose and intention to carry out the letter and spirit and meaning of the pre-election order referred to "as far as it was possible for the fiscal

court to do so; and that they are in good faith attempting to follow the directions of said order as far as possible."

They say that on April 2, 1919, the fiscal court of Bracken county made application to the state of Kentucky for state aid to the extent of $200,000.00 for road construction, and that under the law then in force Bracken county was entitled to 65% of the total cost of the roads constructed in compliance with the requirements of the state, and that all the roads mentioned were built and to be built according to state specifications and under the supervision and direction of the state department of roads.

It is alleged that it is the purpose to construct the turnpikes mentioned in the two contracts, and which constitute parts of project No. 57, in accordance with state specifications and under the supervision and inspection of the department of public roads, and with the definite promise and understanding that they will when finished be taken over by the state and maintained by it as parts of that project; and that there will be refunded to Bracken county 65% of the total cost of both contracts, which aggregate $118,996.00.

It is further averred that it is the purpose of the fiscal court to continue in good faith to carry out the improvements on the systems of roads outlined in the pre-election order, and that the 65% due the county from the state on account of the roads constructed under the contracts in question will be used to continue the improvement of other roads of Bracken county in accordance with the provisions of the pre-election order "in so far as practical," and that the annual levy for turnpike purposes will be used by the fiscal court for the same purpose.

The pre-election order shows on its face that it was entered by the fiscal court to carry out the recommendation of a committee selected by the voters and taxpayers of the county, and that the fiscal court regarded the apportionment made by the committee as a fair and equitable distribution of the road fund proposed to be realized from the bond issue, and that in accordance with such recommendation, and in accordance with such fair and equitable apportionment, it definitely fixed and allotted the amount per mile to be expended on the different classes of turnpike; it designated the first class turnpikes and definitely provided that they should be recon-

structed, "each and every mile of same," according to state specifications, and at a cost not to exceed an average cost of $1,600.00 per mile; and the gross sum of $69,600.00 was specifically set aside out of the said fund "for the sole and only purpose of reconstructing said turnpikes." It will be observed that the total mileage of the first class turnpikes named is 43½ miles, and the gross sum of $69,600.00 is exactly $1,600.00 for each mile.

Then each of the second class turnpikes is designated and the mileage of each given and a calculation will show that the $130,400.00, the gross sum set apart in the order for the improvement of second class pikes at the cost of $1,185.00 per mile, is approximately the gross sum named.

So there can be no doubt from the terms of this order that it was contemplated by the fiscal court when the order was made, and by the voters of the county when they authorized the creation of the debt, that $69,600.00 should be expended on the 43½ miles of the first class turnpikes out of the proceeds of the bond issue, and $130,400.00 thereof expended in the reconstruction and improvement of the second class turnpikes named therein. And from the very terms of the order itself the voters and citizens were given to understand that "each and every mile" of the first and second class turnpikes designated would be improved or reconstructed out of the proceeds of the bond issue, and that the sums so set apart in the order for that purpose would be so expended.

The language of the order is unusually plain and specific; it leaves nothing for interpretation or construction. It was evidently drawn by a committee of citizens who knew what they wanted and knew how to get it.

The uncontradicted allegations of the pleadings as they stand show that, if the two contracts made by the fiscal court in June, 1920, are executed according to their terms, approximately the whole of the proceeds of the $200,000.00 bond issue will have been expended upon three of the first class pikes, with a total mileage of about 37½ miles, and that the remaining 125 or 130 miles of pike, also designated and specifically provided for in the pre-election order, will have nothing expended upon them from the proceeds of the bond issue.

It needs no argument or elaboration to show that this would be not only a gross violation of the terms of the pre-election order, but a plain diversion of the bond fund from the purpose for which it was intended. The order specifically provides for the expenditure of $69,-600.00.00 out of the proceeds of the bond issue on the 43½ miles of turnpike designated as first class turnpikes, at an average cost of $1,600.00 per mile; and it clearly sets apart $130,400.00.00 to be expended on the 110 miles of second class turnpikes designated, at an average of $1,185.00 per mile, and those two items consume the whole $200,000.00 bond issue; and there can be no reasonable doubt that the order was made, and those designations and apportionments included in it, so that the voters would support the proposed bond issue.

It is necessary to consider two questions: first, has the fiscal court authority to dispose of the proceeds of the bond sale except in the manner and for the specific purposes prescribed in the order? Second, does the fact that the state may pay a certain percentage of the cost of the improvements to be made under the contract authorize the fiscal court to exceed the amount to be expended from the proceeds of the bond issue fixed in the pre-election order?

(1) In the case of Scott v. Forrest, County Judge, et al., 174 Ky. 672, the fiscal court, prior to a bond election, named the roads to be constructed with the proceeds of the bond issue. After the election the fiscal court by an order undertook to divert the proceeds to a different purpose, and this court, in considering that question, said:

"Since the order was made prior to the election and at a time when the voters were interested in knowing on what roads the proceeds of the bonds would be used, it cannot be doubted that the voters had the right to rely on the fact that the order expressed the final determination of the fiscal court and to cast their ballots accordingly. Under these circumstances, the order was, in effect, a contract with the people, and good faith requires that the contract be kept. A contrary rule would permit fiscal courts to apply money, voted by the people for one purpose, to another and different purpose for which it would not have been voted had the people been apprised in advance of such intended action."

In the case of Lawrence County v. Lawrence Fiscal Court, 191 Ky. 45, the doctrine in the case of Scott v. Forrest was expressly approved, but the facts in the two cases were differentiated.

The case of Percival, et al. v. City of Covington, et al., 191 Ky. 337, was where a municipality, in its ordinance submitting a proposal to voters, unnecessarily prescribed in the ordinance the mode of payment of the debt proposed to be created, and provided in the ordinance that the city reserved the right to refund all of the said bonds at any interest paying time, at a lower rate of interest, after the expiration of ten years from their date. After the election the city proposed to issue the bonds without incorporating in them this provision, and certain taxpayers instituted an action seeking an injunction. This court, in denying to the municipality the right to issue the bonds without that privilege embraced in them, held that it was not unlawful to embrace such a privilege in the order of submission, and that it was one of the conditions upon which the voters had given their assent to the bond issue, and said:

"The voters having assented to the incurrence of the debt only with the refunding privilege, as defined in the ordinance, as a condition upon which the debt was to be created, it cannot be said that they have ever assented or approved the creation of the debt with such provision eliminated, as the commissioners are now proposing to do. To hold that the commissioners should now be permitted to incur the indebtedness and to issue the bonds therefor and eliminate the provision providing for the refunding privilege, at a lower rate of interest, would be to hold that advantages of the most seductive character could be attached to the proposal to create a municipal debt in the notice and advertisement which submits the matter to the voters, and after the approval of the electorate is obtained by their reliance upon the very advantageous conditions to be attached to the debt, and without which they would not have given their approval, could be eliminated and disregarded."

The reasoning in the two cases quoted from is conclusive of the question in this case. In the creation of indebtedness by municipalities, which can only be created by the voters thereof, the utmost good faith is required in the handling and distribution of the fund so created by the voters. If the voters may be deceived by includ-

ing in the proposals submitted to them for the creation of indebtedness attractive promises and agreements not violative of law, but valuable to them, and after the debt has been created by them the promises and agreements ignored and the fund created by their votes diverted from the purpose for which it was created, voters would soon lose faith in all such promises and agreements, and the result would be that they would never vote to create any indebtedness for public purposes, no matter how worthy or necessary they might be.

In line with the cases quoted, we hold that it was beyond the authority of the fiscal court to enter into any contract to pay out of the proceeds of this bond issue on any road in Bracken county an amount in excess of that fixed in the pre-election order.

(2) It may be fairly assumed from the provision in the pre-election order that the improvements were to be made according to state specifications, and the order was entered and the people voted the bonds with the purpose in view of expending the proceeds of their bond issue in connection with and to get the benefit of the state aid which was then provided for by statute.

But whether this is true or not cannot control the disbursement of the bond fund. What the voters of the county provided for in the pre-election order above everything else was that the fund to be created by their votes, and the proceeds of the debt which they would have to pay, should be equitably and fairly expended upon the various turnpikes of the county, so that all the people thereof would be benefited thereby.

The undenied allegation is that the contract for the reconstruction of the Washington Trace turnpike calls for an expenditure of $7,100.00 per mile, and even if, as alleged in the answer, the state should pay 65% of that amount, there would be left approximately $2,500.00 per mile to be paid by Bracken county out of the proceeds of the bond issue, for under the allegations of the petition the county has no funds outside of that with which to pay for the same. So that, in any aspect of the matter, the solemn compact entered into by the voters and the fiscal court when the pre-election order was entered would be violated and the funds diverted from the purpose for which they were created if this contract should stand.

The demurrer to the answer should have been sustained and the demurrer to the petition overruled.

In the prayer to the petition it is sought to have all warrants issued in payment for any work theretofore done on the Washington Trace turnpike under the contract declared void and illegal, and in one allegation of the answer it is incidentally said that some work has been done under this contract; but in view of these unsatisfactory and vague references, and as there has been, so far as the record discloses, no direct issue made as to the legality of paying for any work that may have been done on the turnpike under the contract before the filing of the suit, if any, we expressly reserve all questions as to the validity of such payments.

The judgment is reversed, with directions to sustain the demurrer to the answer, and to overrule the demurrer to the petition as amended.